**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3149-17
                    A-3979-17
                    A-4584-17
                    A-0137-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

TYQUAN FUQUA,
a/k/a TYOUAN FUQUA,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DEREK FUQUA, a/k/a
DISHAWN FUQUA,
DEREK D. FUQUA,
JAMES FUQUA,
DERRICK FUQUA,
JOHNNIE BROWN,
JAHARIE CROWN,
and DEREK FOQUA,

Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CHANELL VIRGIL,

     Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TREVIS THOMAS,

     Defendant-Appellant.

_____

     Submitted May 24, 2021 – Decided August 20, 2021

     Before Judges Rothstadt and Susswein.

     On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 14-04-0026.

     Joseph E. Krakora, Public Defender, attorney for appellant Tyquan Fuqua in A-3149-17 (Frank M. Gennaro, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Derek Fuqua in A-3979-17 (Richard Sparaco, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Chanell Virgil in A-4584-17 (David A. Gies, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant Trevis Thomas in A-0137-18 (Alyssa Aiello, Assistant Deputy Public Defender, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent in A-3149-17 and A-3979-17 (Adam D. Klein, Deputy Attorney General, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent in A-4584-17 (Steven Cuttonaro, Deputy Attorney General, of counsel and on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent in A-0137-18 (William P. Cooper-Daub, Deputy Attorney General, of counsel and on the brief).

Appellant Derek Fuqua filed pro se supplemental briefs.

PER CURIAM

Defendants Derek Fuqua, Tyquan Fuqua, Trevis Thomas, and Chanell Virgil appeal from their guilty plea convictions arising from their participation in a drug trafficking operation led by Derek Fuqua. The State Police investigation began in 2012 and employed extensive electronic surveillance

authorized pursuant to the New Jersey Wiretapping and Electronic Surveillance Control Act (Wiretap Act), N.J.S.A. 2A:156A-1 to -37. The wiretap portion of the investigation ran over the course of sixty-five days in February through April 2013, during which time nearly 20,000 telephone calls and text messages were intercepted. In all, twenty-two co-defendants were charged in the resulting State Grand Jury indictment.

Defendants contend the State violated the Wiretap Act by intercepting a call that was made to an attorney's office and by failing to adequately "minimize" a number of non-relevant calls, primarily personal conversations during which criminal activity was not discussed. Because defendants Derek Fuqua, Tyquan Fuqua, Thomas,[1] and Virgil all raise the same contentions relating to the minimization requirements of the Wiretap Act, we calendared their appeals back-to-back and now consolidate them for the purpose of issuing a single opinion.

We affirm the trial court's ruling that the State did not violate the Wiretap Act by intercepting Derek Fuqua's call to an attorney's office. The

---

[1] We note that Thomas did not join in the motion to suppress the wiretap evidence and did not participate in the suppression hearing. For reasons we explain later in this opinion, see infra note 5, we nonetheless address on the merits his contention on appeal that his rights under the Wiretap Act were violated by the manner in which intercepted calls were minimized.

A-3149-17

record amply supports the trial court's finding that Fuqua's intercepted conversation was with a secretary or receptionist—rather than an attorney—and that the call related solely to scheduling matters with no discussion of legal advice or disclosure of any confidential information.  Accordingly, that interception violated neither the attorney-client privilege nor the Wiretap Act provision designed to safeguard privileged communications.

Defendants also argued to the trial court that non-relevant telephone calls were improperly monitored, requiring the suppression of all information and evidence derived from the entire electronic surveillance investigation.  The trial court convened a hearing spanning seven nonconsecutive days, during which it listened to the disputed telephone calls, took testimony from State Police witnesses, and heard arguments of counsel.  The trial court rendered a twenty-two-page written decision in which it ruled that although "better efforts could have been utilized in the monitoring" of a "hand full of calls," the State Police monitors did not violate the Wiretap Act.

After carefully reviewing the record in light of the arguments of the parties and applicable principles of law, we affirm the trial court's ruling with respect to the specific calls analyzed in the court's well-reasoned written decision.  However, for reasons that are not made clear in the record, the court

A-3149-17

did not analyze and rule on five calls challenged by defendants that were played and discussed at the suppression hearing. We therefore are constrained to remand the matter for the trial court to make findings of fact and conclusions of law with respect to those five disputed phone calls that are not specifically addressed in its May 17, 2016 written decision.

Furthermore, with respect to call #1,117 made on March 18, 2013, the court's ruling that the monitoring of the call was not unreasonable appears to have been contingent upon the State providing additional information that the parties to that call had previously discussed criminal activity. The record before us does not indicate whether the State complied with the trial court's instruction to supply that additional information. We therefore remand for the trial court to make definitive findings with respect to this particular call.

In addition to the minimization contentions, defendants argue the State failed to comply with the statutory requirement to immediately seal the wiretap recordings. The wiretap authorization expired on April 3, 2013. On that date, the State asked the Assignment Judge to seal the recordings. The judge directed the State to return several days later. The State complied with that instruction and the judge sealed the recordings on April 9, 2013. We affirm

A-3149-17

the trial court's ruling that the State provided a satisfactory explanation for the six-day delay and thus did not violate the Wiretap Act.

In addition to the wiretap-related contentions, defendant Thomas appeals from the denial of his motion to suppress illicit drugs found in a warrant search of a vehicle in which he was a passenger. Thomas first argued to the trial court that the vehicle was unlawfully stopped. After the trial court took testimony at the suppression hearing, the defense submitted a supplemental brief arguing that the probable cause set forth in the search warrant application was tainted because the drug detection canine unlawfully entered the vehicle.

The trial court addressed the canine sniff contention and found the dog entered the vehicle unlawfully. The court nonetheless ruled there was adequate probable cause to support the ensuing search warrant application based on information obtained from independent sources. Because the dog sniff issue was not raised until after the police witnesses had testified at the suppression hearing, we conclude the State was deprived an opportunity to present testimony concerning the circumstances in which the dog examined the vehicle. Importantly, the State had no reason to clarify on the record whether the dog alerted to the presence of controlled dangerous substances (CDS) after first examining the exterior of the vehicle. Accordingly, we deem it necessary

7

to remand the matter for a new hearing to establish the exact circumstances and timing of the dog scent examination.

With respect to the trial court's conclusion that the search warrant can be sustained based on information from sources independent of the canine sniff, the State acknowledges the court did not consider and make findings with respect to two of the three elements that must be established by clear and convincing evidence to invoke the independent source exception to the exclusionary rule under State v. Holland, 176 N.J. 344 (2002). We therefore remand the matter for the court to make findings of fact and conclusions of law with respect to all three prongs of the independent source doctrine.

Defendant Virgil appeals from the denial of her motion to withdraw her guilty plea on the grounds she received a sentence of community service that was not explicitly contemplated in her plea agreement. We affirm the denial of her motion to withdraw her guilty plea for the reasons explained in the trial court's oral opinion. Virgil also appeals from the denial of her motion for a mistrial based on prosecutorial misconduct during the trial, which was interrupted when defendant and her trial co-defendants pled guilty. Virgil did not preserve the right to challenge the denial of her mistrial motion and we therefore decline to consider that contention on appeal.

A-3149-17

## I.

We briefly summarize the relevant circumstances surrounding each appeal:

<u>Derek Fuqua</u>

Derek Fuqua was the alleged leader of the drug trafficking operation. He was charged in the State Grand Jury indictment with: first-degree racketeering, N.J.S.A. 2C:41-2(c) and (d); second-degree conspiracy to distribute or possess with intent to distribute CDS, N.J.S.A. 2C:5-2; first-degree leader of a narcotics trafficking network, N.J.S.A. 2C:35-3; first-degree distribution of CDS, N.J.S.A. 2C:35-5(a)(1), (b)(1), and (c); first-degree possession with intent to distribute CDS (heroin), N.J.S.A. 2C:35-5(a)(1), (b)(1), (c), and N.J.S.A. 2C:2-6; first-degree possession with intent to distribute CDS (cocaine), N.J.S.A. 2C:35-5(a)(1), (b)(1), and N.J.S.A. 2C:2-6; first-degree maintaining or operating a CDS production facility, N.J.S.A. 2C:35-4 and N.J.S.A. 2C:2-6; second-degree distribution of CDS, N.J.S.A. 2C:35-5(a)(1) and (b)(2); second-degree unlawful possession of a weapon, N.J.S.A. 2C:58-5 and N.J.S.A. 2C:39-5(b); second-degree possession of weapons during commission of certain crimes, N.J.S.A. 2C:35-5, N.J.S.A. 2C:39-4.1(a), and N.J.S.A. 2C:2-6; third-degree distribution of CDS on or

within 1,000 feet of school property, N.J.S.A. 2C:35-7; third-degree maintaining a fortified premises, N.J.S.A. 2C:35-4.1 and N.J.S.A. 2C:2-6; second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b); and second-degree financial facilitation of criminal activity (money laundering), N.J.S.A. 2C:21-25(a), (b), and N.J.S.A. 2C:2-6.

On June 10, 2016, Derek Fuqua pled guilty to the first-degree leader of a narcotics trafficking network charge pursuant to a negotiated agreement. In exchange for the guilty plea, the State agreed to dismiss the remaining charges and to recommend a twenty-four-year state prison term with a twelve-year period of parole ineligibility. Defendant was sentenced in accordance with the plea agreement in February 2018.

Through counsel, he raises the following contentions for our consideration:

> POINT I
>
> THE STATE FAILED TO FOLLOW PROCEDURES STRICTLY REQUIRED BY THE WIRETAP ACT, THEREFORE THESE RECORDINGS MUST BE SUPPRESSED.
>
> > A. THE STATE FAILED TO MINIMIZE THE INTERCEPTED RECORDINGS PURSUANT TO THE WIRETAP ACT.

A-3149-17

B. SUPPRESSION IS REQUIRED DUE TO THE FAILURE TO SEAL THE RECORDINGS IN A TIMELY MANNER IN VIOLATION OF THE WIRETAP ACT.

Derek Fuqua also submitted a supplemental pro se merits brief, in which he contends:

POINT I

IN MAKING REPEATED FINDINGS THAT WIRETAP MONITORS SHOULD HAVE ELIMINATED OR FURTHER MINIMIZED CALLS THAT WERE NOT RELEVANT TO THE OFFENSES SPECIFIED IN THE WIRETAP ORDER, THE TRIAL COURT COMMITTED LEGAL ERROR BY FAILING TO ORDER THE SUPPRESSION OF ALL COMMUNICATIONS SEIZED IN CONNECTION TO THE WIRETAP UNDER N.J.S.A. 2A:156A-21.

[POINT II]

THE TRIAL COURT COMMITTED LEGAL ERROR IN RULING THAT: (1) THE ATTORNEY-CLIENT PRIVILEGE DOES NOT EXTEND TO AN ATTORNEY'S SECRETARY ACTING AS AN INTERMEDIARY BETWEEN DEFENDANT AND HIS ATTORNEY; (2) UNLESS UNLAWFULLY INTERCEPTED COMMUNICATIONS BETWEEN A CLIENT AND HIS ATTORNEY DISCLOSES MATTERS INVOLVING TRIAL STRATEGY IT DOES NOT VIOLATE THE WIRETAP ACT OR THE ATTORNEY-CLIENT PRIVILEGE; AND (3) SUPPRESSION OF THE WIRETAP WAS NOT REQUIRED UNDER N.J.S.A. 2A:156A-21 WHERE A COURT FINDS THAT THE WIRETAP ACT PROVISION(S) HAVE BEEN VIOLATED.

11

Tyquan Fuqua

In April 2013, State Police executed a search warrant of Tyquan Fuqua's residence. The probable cause for the search warrant was based on information learned from wiretap interceptions. He was charged in the State Grand Jury indictment with first-degree racketeering, N.J.S.A. 2C:41-2(c) and (d); second-degree conspiracy to distribute or possess with intent to distribute CDS, N.J.S.A. 2C:35-5(a)(1), (b)(1), (c), and N.J.S.A. 2C:5-2; third-degree possession with intent to distribute CDS, N.J.S.A. 2C:35-5(a)(1) and (b)(3); third-degree possession with intent to distribute on or near school property, N.J.S.A. 2C:35-5(a) and N.J.S.A. 2C:35-7; third-degree maintaining a fortified premises, N.J.S.A. 2C:35-4.1; and second-degree money laundering, N.J.S.A. 2C:21-25(a), (b), and N.J.S.A. 2C:2-6.

Tyquan Fuqua and co-defendant Rashaun Bryant[2] moved to dismiss several counts of the indictment and for a hearing pursuant to Franks v. Delaware.[3] The trial court denied both motions, concluding in a written opinion that the State had presented to the grand jury a prima facie case of racketeering, conspiracy, possession of CDS with intent to distribute,

---

[2] Co-defendant Rashaun Bryant is not a party to this appeal.

[3] 438 U.S. 154 (1978). The Franks issue is not before us in this appeal.

possession of CDS on or near school property, maintaining a fortified premise, and money laundering.

On June 10, 2016, pursuant to a negotiated agreement, Tyquan Fuqua pled guilty to the count charging third-degree possession of CDS with intent to distribute. The State agreed to dismiss the remaining charges. On January 12, 2018, the court sentenced defendant to a three-year prison term in accordance with the plea agreement.

Tyquan Fuqua raises the following contention for our consideration:

> POINT I
>
> THE TRIAL COURT IMPROPERLY DENIED DEFENDANT'S MOTION TO SUPPRESS THE WIRETAP EVIDENCE.

Trevis Thomas

On March 18, 2013, Jersey City police officers, acting at the behest of the State Police, initiated a stop of a vehicle in which Thomas was a passenger. A drug detection canine was brought to the scene and alerted to the presence of CDS in the vehicle. Police then obtained a warrant to search the vehicle, which revealed CDS in a hidden compartment.

Thomas was charged in the State Grand Jury indictment with first-degree racketeering, N.J.S.A. 2C:41-2(c); second-degree conspiracy to distribute a

controlled dangerous substance, heroin, N.J.S.A. 2C:5-2; first-degree possession with the intent to distribute a controlled dangerous substance, heroin, N.J.S.A. 2C:35-5(a)(1), N.J.S.A. 2C:35-5(b)(1), N.J.S.A. 2C:35-5(c), and N.J.S.A. 2C:2-6; and second-degree money laundering, N.J.S.A. 2C:21-25(a), N.J.S.A. 2C:21-25(b), and N.J.S.A. 2C:2-6.

Defendant filed a motion to suppress the CDS found in the vehicle. The trial court convened a two-day suppression hearing on May 18 and June 3, 2015, after which the court rendered a written opinion denying the suppression motion.

Defendant's jury trial commenced on May 17, 2017. He was tried along with co-defendant Virgil and another co-defendant, Shakera Styles.[4] On May 23, 2017, in mid-trial, Thomas pled guilty to the count of the indictment charging him with racketeering. During the plea hearing, defendant expressly preserved the right to appeal the denial of his motion to suppress the fruits of the vehicle search and the denial of his co-defendants' motion to suppress the

---

[4] Co-defendant Styles is not a party to this appeal.

evidence derived from the wiretap interceptions based on the alleged minimization violations.[5]

Thomas raises the following contentions for our consideration:

POINT I

THE MOTION JUDGE ERRED IN DENYING SUPPRESSION OF THE EVIDENCE SEIZED FROM THE VAN BECAUSE EACH PRONG OF THE INDEPENDENT-SOURCE TEST WAS NOT ESTABLISHED.

    A. THE MOTION JUDGE FAILED TO SCRUPULOUSLY APPLY EACH PRONG OF THE INDEPENDENT-SOURCE EXCEPTION, AS REQUIRED UNDER STATE V. HOLLAND, 176 N.J. 344 (2009).

    B. BECAUSE THE STATE FAILED TO ESTABLISH ALL THREE PRONGS OF THE INDEPENDENT-SOURCE EXCEPTION, SUPPRESSION IS REQUIRED. IN THE ALTERNATIVE, THE MATTER MUST BE

---

[5] As we have noted, Thomas did not join in his co-defendants' motion to suppress the wiretap evidence based on the alleged minimization violations, and thus did not participate in that suppression hearing. As a general matter, a defendant who has not raised an issue in the Law Division will not be permitted to raise that issue on appeal unless he or she demonstrates plain error that was "clearly capable of producing an unjust result." R. 2:10-2; see also State v. Macon, 57 N.J. 325, 336 (1971). In this instance, however, because the trial court accepted Thomas's guilty plea that expressly preserved the right to appeal the denial of co-defendants' motion to suppress the wiretap evidence, we consider Thomas's contention on appeal as if he had participated in the motion to suppress the wiretap evidence.

REMANDED FOR THE MOTION JUDGE TO CONDUCT A PROPER INDEPENDENT-SOURCE ANALYSIS.

POINT II

THE MOTION JUDGE ERRED IN DENYING SUPPRESSION OF WIRETAP EVIDENCE TAINTED BY THE STATE'S FAILURE TO MINIMIZE AN INTERCEPTED TELEPHONE CALL MADE BY A CO[-]DEFENDANT TO HIS LAWYER'S OFFICE.

Chanell Virgil

Defendant Virgil was charged in the State Grand Jury indictment with first-degree racketeering, N.J.S.A. 2C:41-2(c) and N.J.S.A. 2C:41-2(d); second-degree conspiracy to distribute a controlled dangerous substance, heroin, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:35-10(a)(1); and second-degree money laundering, N.J.S.A. 2C:21-25(a) and N.J.S.A. 2C:21-25(b).

On May 17, 2017, Virgil proceeded to trial along with co-defendants Thomas and Styles. During the State's opening, Virgil's counsel objected to remarks made by the prosecutor in his opening statement and moved for a mistrial. The trial court found the deputy attorney general's comment was inappropriate but denied the motion for a mistrial. Instead, the court gave a limiting instruction to the jury.

16

As we have already noted, on May 23, 2017, the trial was interrupted when Virgil entered a guilty plea to the count of the indictment charging third-degree conspiracy to possess CDS. On August 11, 2017, the court sentenced Virgil to a three-year term of probation in accordance with the plea agreement. She was ordered to perform fifty hours of community service as one of the conditions of probation. The prospect of performing community service was not specifically mentioned in the terms of the plea agreement or during the plea colloquy.

Subsequently, defendant filed a motion to withdraw her guilty plea, contending the sentence imposed did not match her reasonable expectations from her negotiated agreement. On January 12, 2018, the sentencing judge held a hearing and rendered an oral decision denying Virgil's motion to withdraw her guilty plea.

Virgil raises the following contentions for our consideration:

> POINT I
>
> THE TRIAL JUDGE'S DENIAL OF DEFENDANT'S MOTION TO WITHDRAW HER GUILTY PLEA WAS ERRONEOUS WHERE THE SENTENCE IMPOSED DID NOT MEET HER REASONABLE EXPECTATION OF THE NEGOTIATED PLEA AGREEMENT.

POINT II

THE MOTION JUDGE'S FAILURE TO CONSIDER THE SUBJECTIVE GOOD FAITH OF THE WIRETAP MONITORS WAS REVERSIBLE ERROR.

POINT III

THE TRIAL JUDGE ERRED WHERE [HE] DID NOT DECLARE A MISTRIAL AFTER THE DEPUTY ATTORNEY GENERAL'S OPENING STATEMENT WHICH, BY HIS INFLAMMATORY AND ARGUMENTATIVE REMARKS, SUBSTANTIALLY PREJUDICED DEFENDANT'S FUNDAMENTAL RIGHT TO HAVE A JURY FAIRLY ASSESS THE PERSUASIVENESS OF HER CASE.

II.

We first consider defendants' contentions that their rights under the Wiretap Act were violated.[6] Defendants raise three distinct arguments that we address in turn: (1) the State improperly intercepted a telephone call to an attorney's office, constituting a per se violation of the Wiretap Act; (2) the wiretap monitors failed to properly minimize specified personal telephone conversations that were not relevant to criminal activity; and (3) the State

___

[6] The motion was brought by co-defendants Derek Fuqua, Cynthia Fuqua, Tyquan Fuqua, Marion Darby, Rashaun Bryant, Jennifer Morfa, Andre Childs, Shakera Styles, and Chanell Virgil. Co-defendants Cynthia Fuqua, Darby, Bryant, Morfa, Childs, and Styles are not parties to this appeal.

18

failed to immediately seal the recorded interceptions at the expiration of the wiretap order.

## A.

We first address defendants' contention that the State improperly intercepted a call, Call #18,179, that Derek Fuqua placed to a law firm. Defendants contend this interception violated the attorney-client privilege and constitutes a violation of N.J.S.A. 2A:156A-11,[7] which generally prohibits the interception of attorney-client conversations.

---

[7] N.J.S.A. 2A:156A-11, which affords special protection to privileged communications, provides in pertinent part:

> If the facilities from which, or the place where, the wire, electronic or oral communications are to be intercepted are being used, or are about to be used, or are leased to, listed in the name of, or commonly used by . . . an attorney-at-law . . . no order [for interception] shall be issued unless the court, in addition to the matters provided in section 10 of [L. 1968, c. 409 ( N.J.S.A. 2A:156A-10)], determines that there is a special need to intercept wire, electronic or oral communications over such facilities or in such places. Special need as used in this section shall require in addition to the matters required by section 10 of [L. 1968, c. 409 (N.J.S.A. 2A:156A-10)], a showing that the . . . attorney-at-law. . . is personally engaging in or was engaged in over a period of time as a part of a continuing criminal activity or is committing, has or had committed or is about to commit an offense[.]

We reproduce verbatim the disputed call:

FEMALE:  Law firm.

DEREK FUQUA:  Yeah, my name is Derek Fuqua. I'm calling because I'm on the Woodbridge court schedule.
I'm trying to find out what court it is there.

FEMALE:  Okay, hold on.

DEREK FUQUA:  All right.

[Defendant is placed on hold]

FEMALE:  Hey, hi.  So, good morning.  You said you were in Woodbridge court?

DEREK FUQUA:  Yes.

FEMALE:  And did you speak with anyone regarding the court date?

DEREK FUQUA:  Um, I'm—I just came to the court date (indiscernible).

FEMALE:  Okay.  All right.  Your name was on the calendar?

DEREK FUQUA:  (Indiscernible) I'm just walking in. I was caught in traffic.  That's all I'm trying to see (indiscernible).

FEMALE:  Okay, how do I spell your last name?

[Defendant spells his name]

FEMALE:  Ah, okay.  All right.

20

DEREK FUQUA:  Yes.

FEMALE:  We have a 6:45 for you on the calendar, actually at night.

DEREK FUQUA:  Oh, it is?

FEMALE:  Uh-huh.

DEREK FUQUA:  All right.

FEMALE:  Night court.

DEREK FUQUA:  All right, no problem.  Thanks.

FEMALE:  Okay.  Thanks, bye.

The State Police monitor listening to the call live believed that Derek Fuqua was speaking to a court representative.[8]  We agree with the trial court that this interception did not violate either the attorney-client privilege or the Wiretap Act.  "[T]he attorney-client privilege generally applies to communications (1) in which legal advice is sought, (2) from an attorney acting in his capacity as a legal advisor, (3) and the communication is made in confidence, (4) by the client."  Hedden v. Kean Univ., 434 N.J. Super. 1, 10 (App. Div. 2013).  This privilege does not protect all communications with a

---

[8]  The record before us does not identify the law firm and does not indicate whether Derek Fuqua was represented by that firm or whether Fuqua contacted the firm because the municipal court judge was associated with it.

law firm. Rather, it only protects communications made between a "lawyer and his client in the course of that relationship and in professional confidence." Tractenberg v. Twp. of W. Orange, 416 N.J. Super. 354, 375 (App. Div. 2010) (quoting N.J.R.E. 504(1)). Although in certain circumstances the privilege may extend to interactions between the client and a lawyer's agent—such as an investigator or a secretary—the "sine qua non of the privilege is that the client has consulted the lawyer in the latter's capacity as an attorney." L.J. v. J.B., 150 N.J. Super. 373, 377 (App. Div. 1977); see also Fellerman v. Bradley, 99 N.J. 493, 499 (1985) ("For a communication to be privileged it must initially be expressed by an individual in his capacity as a client in conjunction with seeking or receiving legal advice from the attorney in his capacity as such, with the expectation that its content remain confidential.").

The transcript of the intercepted call confirms that although Derek Fuqua contacted a law firm and spoke with a secretary or receptionist employed by the firm, he did not do so while in the course of seeking or discussing legal advice. Rather, defendant merely sought information regarding the scheduling of a court date and was provided with that information. Further, no confidential information was discussed. Accordingly, we affirm the trial court's ruling that listening to this call did not violate the attorney-client

22

privilege or the Wiretap Act provision designed to protect privileged communications.

## B.

We turn next to defendants' contention that the wiretap monitors improperly minimized non-relevant phone calls. We begin by acknowledging the legal principles that guide our review of alleged Wiretap Act violations. As a general matter, the scope of our review of the denial of any suppression motion is limited. State v. Handy, 206 N.J. 39, 44–45 (2011). We "must uphold the factual findings underlying the trial court's decision, so long as those findings are 'supported by sufficient credible evidence in the record.'" State v. Evans, 235 N.J. 125, 133 (2018) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). "An appellate court 'should give deference to those findings of the trial judge which are substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Elders, 192 N.J. at 244. A trial judge's credibility determinations therefore should be upheld if they are supported by sufficient, credible evidence. State v. S.S., 229 N.J. 360, 374 (2017).

In contrast, we review the trial court's legal conclusions de novo. Id. at 380. Because issues of law "do not implicate the fact-finding expertise of the

trial courts, appellate courts construe the Constitution, statutes, and common law de novo—with fresh eyes—owing no deference to the interpretive conclusions of trial courts, unless persuaded by their reasoning." Ibid. (quoting State v. Morrison, 227 N.J. 295, 308 (2016)) (internal quotation marks omitted). Accordingly, we are not bound by a trial court's interpretations of the legal consequences that flow from established facts. See Manalapan Realty LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). In the event of a mixed question of law and fact, we review a trial court's determinations of law de novo but will not disturb a court's factual findings unless they are "clearly erroneous." State v. Marshall, 148 N.J. 89, 185 (1997).

Turning to substantive legal principles, our Supreme Court has made clear that the Wiretap Act "must be strictly construed to safeguard an individual's right to privacy." State v. Ates, 217 N.J. 253, 268 (2014) (citing State v. Worthy, 141 N.J. 368, 379–80 (1995)). Wiretap orders must "require that such interception begin and terminate as soon as practicable and be conducted in such a manner as to minimize or eliminate the interception of such [non-relevant communications] by making reasonable efforts, whenever

24

possible, to reduce the hours of interception authorized by said order." N.J.S.A. 2A:156A-12(f).

This process is commonly referred to as "minimization." In State v. Catania, our Supreme Court explained:

> In addition to being required by statute, minimization is thus necessary to safeguard an important constitutional value: the privacy right of those who use the telephone to be secure from indiscriminate wiretapping that intercepts all conversations, no matter how non-relevant or personal, in violation of the Fourth Amendment proscription against unreasonable searches and seizures.
>
> [85 N.J. 418, 429 (1981).]

The Court stressed that when executing a wiretap order, "police must make reasonable efforts to minimize intrinsically as well as extrinsically." Id. at 434. "'Extrinsic' minimization is accomplished by simply limiting the hours and total duration of interception, while 'intrinsic' minimization is accomplished by terminating the interception of individual phone calls within those hours as it becomes apparent to the monitors that the call is not relevant to the investigation." Id. at 429. The Catania Court further explained:

> [o]ne [method of intrinsic minimization] is "spot monitoring," a technique whereby the monitoring agent stops listening to a conversation if, after a short while, it appears to be irrelevant. However, rather than terminating the interception indefinitely, the

25

agent continues to tune in periodically to see if the conversation has turned to criminal matters. If it has, then he [or she] resumes full interception. Spot monitoring would protect the privacy of innocent callers without providing a loophole through which criminals could avoid detection by prefacing their conversations with innocent small talk. . . . Moreover, spot monitoring is highly persuasive evidence of a good-faith intention on the part of the monitors to minimize.

[Id. at 446.]

Extrinsic minimization is essentially determined by the judge issuing the wiretap authorization, who sets the hours during which calls made to or from designated telephone facilities may be intercepted. In this appeal, we focus on the State Police monitors' intrinsic minimization efforts. To survive judicial scrutiny, those intrinsic minimization efforts must be both "objectively reasonable" and made in "subjective good faith." Id. at 438.

Although the requirements of the Wiretap Act must be strictly enforced, the Court in Catania acknowledged that judicial review of intrinsic minimization does not impose an impracticable standard that might "force monitors to terminate prematurely their interception of phone calls which begin on an innocent note but later turn to discussions of criminal activity." Id. at 445. Importantly, the Court recognized that "monitors are not prophets, and thus they are not expected to anticipate and screen out all non-relevant

26

phone calls. All they are expected to do is make reasonable efforts to identify innocent, non-relevant phone calls and minimize their interception." Ibid.

The Court in Catania adopted the three-pronged test devised in Scott v. United States, 436 U.S. 128 (1978), to determine whether wiretap monitors made reasonable efforts to minimize interceptions of non-relevant calls. Id. at 432–34 (1981). Under this analytical framework, reviewing courts must consider: (1) "the nature of the individual phone calls"; (2) "the purpose of the wiretap"; and (3) "the reasonable expectation of the [law enforcement monitors] as to what they would overhear based on the information available to them at the time of the wiretap . . . ." Id. at 433–34.

The first factor takes into account that the nature of a particular call may make it difficult to minimize. Id. at 433. Reviewing courts must consider, for example, whether the language used in the conversation is "ambiguous," "guarded," or "cryptic." Ibid. Additionally, some calls may be of short duration, providing the monitor with little opportunity to determine the call's relevance to criminal activity. Ibid.; see also State v. Pemberthy, 224 N.J. Super. 280, 300 (App. Div. 1988) ("The fact that entire conversations of brief duration were recorded . . . [does] not affect the overall intent to minimize.").

27

The second factor in the <u>Scott</u>/<u>Catania</u> analytical framework—the purpose of the wiretap—recognizes that broader electronic surveillance efforts are justified when necessary to "determine the full scope of [an] enterprise" when police are investigating a conspiracy. <u>Catania</u>, 85 N.J. at 433. A CDS distribution conspiracy may entail communications with drug suppliers, co-conspirators, and established or potential new customers. The inherent nature of a narcotics conspiracy, in other words, suggests the criminal enterprise may involve a large number of participants arrayed along the drug distribution hierarchy, ranging from end-use purchasers, street-level retailers, mid-level wholesalers, to upper-echelon traffickers.

The third factor, which requires reviewing courts to consider the "reasonable expectations" of the monitors, recognizes that wiretap monitors may be justified in intercepting a broader scope of calls in the beginning of a wiretap investigation before "patterns of relevant and non-relevant phone calls" emerge. <u>Id.</u> at 434. Those patterns allow monitors to more precisely tailor their minimization efforts as they gain experience in understanding the communication practices and tendencies of the targets. These emerging patterns may show that specific targets routinely discuss both relevant and non-relevant topics in their conversations. In other words, monitors may learn

over the course of the wiretap investigation that certain targets often discuss both personal matters and matters relating to the business of drug trafficking in a single conversation. Such a pattern would justify intercepting a broader range of calls and listening in on a greater proportion of an individual call, comparable to the scope of interception that is permitted at the outset of the wiretap investigation before any patterns are discerned.

Failure to comply with the Wiretap Act's substantive or critical requirements results in the suppression of evidence. Worthy, 141 N.J. at 381–86; N.J.S.A. 2A:156A-21. The suppression remedy for a minimization violation is strictly imposed. Before Catania, the State's failure to minimize interception of non-relevant conversations resulted only in the suppression of those particular conversations, rather than the entire wiretap investigation. See State v. Dye, 60 N.J. 518, 539–42 (1972). The Court in Catania, construing remedial legislative amendments to the Wiretap Act adopted after Dye, rejected that approach, noting:

> The flaw in this approach was that it would not deter the State from disregarding the minimization provision, because only innocent and non-relevant conversations would be suppressed while the relevant ones would remain admissible. The Legislature responded by amending N.J.S.A. 2A:156A-21 to provide that any minimization violation would result in the suppression of the "entire contents of all . . .

communications." The Legislature concluded that only by avoiding such a fragmented approach to wiretapping such as that espoused by Dye could minimization violations be deterred. . . . That logic is applicable here. In keeping with this legislative desire for a unitary, rather than a fragmented, approach to wiretapping, we conclude that a defendant who was party to at least one conversation, innocent or incriminating, during the course of a wiretap has standing to suppress the entire wiretap results because of the State's failure to minimize its interception of any conversations during the course of that wiretap.

[85 N.J. at 426 (emphasis added) (internal citations omitted).]

Accordingly, if a reviewing court finds a minimization violation, the entire contents of all intercepted communications and evidence derived therefrom must be suppressed. See Worthy, 141 N.J. at 387. This rule "thus manifests an unequivocal legislative intent to regulate wiretapping as strictly as possible." Catania, 85 N.J. at 438 (citing S. Judiciary Comm. Statement to S. 1417 (L. 1975, § 13)). The Supreme Court has further acknowledged that the Wiretap Act's "exclusionary rule is not conditioned on a predicate finding of an intentional or deliberate violation or evasion of the Act's requirements." Worthy, 141 N.J. at 385.

C.

With those guiding principles in mind, we next consider the facts that were elicited at the suppression hearing. The initial wiretap order was issued on February 6, 2013 and was renewed on March 4, 2013. The wiretap ran for a total of sixty-five days and permitted interception at all hours of the day, seven days a week. At the outset, the wiretap was limited to Derek Fuqua's phone. As the scope of the racketeering investigation expanded, the wiretap authorization order was amended to include phones belonging to Tyquan Fuqua, Rashaun Bryant, and Kevin Harrell.[9]

State Police Detective Dan Connolly, who supervised the wiretap investigation, testified that the monitors attended a meeting at which a deputy attorney general instructed them as to proper intrinsic minimization procedures. The monitors were instructed, for example, that they were not permitted to listen to calls "involving attorneys, doctors, or clergy," but were told that if they were "unsure what [was] being discussed, [they were to] continue to monitor the call until some additional patterns and practices [we]re established."

---

[9] Co-defendants Rashaun Bryant and Kevin Harrell are not parties to this appeal.

A-3149-17

With respect to those patterns and practices, Detective Connolly testified that Derek Fuqua discussed both personal matters and criminal business in his conversations. The detective explained: "Derek Fuqua used family and close friends, not only in a social setting, but they were also part of his criminal conspiracy and he talked business and socially with these individuals within the same phone call on multiple occasions."[10]

State Police Detective Thomas Kulpinski testified that the wiretap was administered through a software program called VoiceBox, which is a "statewide network which facilitates the collection of information when authorized by court order." Detective Kulpinski explained that to use the electronic surveillance system, a law enforcement monitor must activate the program's monitoring function, which would "place that particular target phone number in a situation where if a communication would come in, the monitor would . . . be presented with a control window that would come up when an audio event occurs." The detective further explained that the control window provides the monitor the ability to listen to the communication live, ignore the communication before it occurs, or intrinsically minimize portions of a

_____

[10] We note that many of those individuals were charged in the State Grand Jury indictment, including: Tyquan Fuqua (cousin), Cynthia Fuqua (mother), Alfonso Fuqua (relative), Rahim Fuqua (brother), James Fuqua (relative), Jennifer Morfa (girlfriend), and Tamara Reichard (girlfriend).

32

communication as it unfolds. The latter practice, the detective explained, is commonly referred to as spot monitoring.

Detective Kulpinski further testified that when a monitor minimizes a communication, there is no way for him or her to listen to the conversation during the period of minimization. As the detective explained, when the monitor hits the minimization button, the content is "irrevocably gone from the system."

During the course of the seven-day suppression hearing, the trial court listened to the disputed calls that defendants claimed to be improperly minimized and heard arguments from the parties concerning each of those specific communications.

The trial court issued a written opinion on May 17, 2016 in which it made detailed findings with respect to sixty-four calls. The court concluded that while the State might have made better efforts to minimize several calls, the monitors made reasonable efforts to adhere to their duty to minimize with subjective good faith. The trial court noted, "[i]n the context of the contemplated conspiracy involving the numerous persons of interest and the 24-hour wiretap, the monitors ultimately demonstrated good-faith and an objectively reasonable attempt with the law." The trial court further remarked,

"[t]he record shows reasonable good-faith attempts were made to consistently minimize and spot check personal, irrelevant, and non-pertinent calls."

In reaching that conclusion, the trial court made specific and detailed factual findings.[11] The court found, for example, that the monitors had been instructed on and understood the minimization criteria set forth in Catania and were further instructed to engage in spot-monitoring. The court viewed those instructions as "highly persuasive evidence of good-faith intention . . . to minimize." See Catania, 85 N.J. at 446.

The court also found that "since various family members were involved in the conversations, and many of the calls were difficult to ascertain the nature of the conversation, the investigators could reasonably conclude that the conversations may be pertinent [to criminal activity]." Because the investigation involved a conspiracy, moreover, the court noted that "broader

---

[11] Derek Fuqua argues in his pro se supplemental merits brief that the trial court "unquestionably found minimization violations" in fourteen calls. That is incorrect. See also infra note 12. Defendant conflates a finding that there was no minimization of a particular call with a finding that the statutory minimization requirement was violated. As we have noted, the Court in Catania recognized the short duration of a call makes it difficult for monitors to determine relevancy. 85 N.J. at 435. Thus, the lack of minimization of a short-duration call does not necessarily constitute a violation. Accord Pemberthy, 224 N.J. Super. at 300 ("The fact that entire conversations of brief duration were recorded, especially at the beginning of the investigation, did not affect the overall intent to minimize.").

34

interception [wa]s justified" because "it was necessary to ascertain a full scope of the conspiracy and identify the participants." The court further noted that most of the disputed calls were short in duration, and that most of the calls deemed non-pertinent were minimized.

The trial court applied the three factors set out in Catania, concluding they weighed in favor of finding objectively reasonable and subjectively good-faith efforts to minimize. After carefully reviewing the record, we agree with the trial court's application of the Scott/Catania factors with respect to all of the disputed calls the trial court specifically analyzed in its written opinion. The record supports the conclusion, with respect to the calls analyzed by the trial court, that the State demonstrated both objective reasonableness and subjective good faith.

We emphasize that, as in Catania, no clear pattern emerged as to either non-incriminating conversations or non-relevant callers. 85 N.J. at 435. As the trial court aptly noted, it was not "uncommon for [the callers] to discuss personal issues with criminal business activity." That made it impossible for monitors to minimize all non-relevant communication. Spot monitoring, after all, is not an exact science—there is no precise mathematical formula to inform monitors when to turn off a live call and when to turn it back on. We

reiterate the Supreme Court's admonition in <u>Catania</u>: "monitors are not prophets, and thus they are not expected to anticipate and screen out all non-relevant phone calls. All they are expected to do is make reasonable efforts to identify innocent, non-relevant phone calls and minimize their interception." <u>Id</u>. at 445.

Viewed through that pragmatic lens, the trial court's observation that "better efforts" could have been made in minimizing a "hand full" of calls does not suggest the monitors violated their objective and subjective good-faith obligations under the Wiretap Act. The trial court ultimately concluded the monitors had not violated the Wiretap Act.[12] We agree with that conclusion. As the Supreme Court aptly noted in <u>State v. Burstein</u>,

> Although some additional calls might conceivably have been minimized, we have never required the State to minimize its interception of all non-relevant phone calls. <u>This would require a prescience on the part of the police that is simply not possible</u>. Rather, we require only that the State make <u>reasonable efforts</u> to terminate its interception of non-relevant phone

---

[12] We note that as to call #10,797, which Derek Fuqua made to an automobile dealership, the trial court stated "[c]learly, this call is non-pertinent and should have been minimized." However, the court also determined, "[t]he call is of short duration" and that "throughout the call, the defendant was placed on hold and various auto commercials were being played over the phone system." Read in the context of the trial court's ultimate holding, we do not interpret the court's opinion as finding that the failure to minimize this particular call was a violation of the Wiretap Act.

> calls. Our review of the facts in this case convince us
> that such efforts were made here.
>
> [85 N.J. 394, 416 (1981) (emphasis added).]

In performing our review function, we strive to achieve the delicate balance between avoiding unnecessary intrusion upon personal, non-criminal conversations on the one hand, and the public safety interest in recording conversations regarding criminal activity on the other hand. In reaching that balance, we underscore that the statutory and constitutional benchmarks are objective reasonableness and subjective good faith, not perfection as viewed through the lens of hindsight. We also acknowledge that the trial court judge was a specially-designated wiretap judge[13] well-experienced in the practical administration and enforcement of the Wiretap Act. Cf. Cesare v. Cesare, 154 N.J. 394, 413 (1998) (recognizing that deference is accorded to factfinding by

---

[13] Wiretap judges are specially designated by order of the Chief Justice pursuant to N.J.S.A. 2A:156A-2(i), which provides:

> "Judge," when referring to a judge authorized to receive applications for, and to enter, orders authorizing interceptions of wire, electronic or oral communications, means one of the several judges of the Superior Court to be designated from time to time by the Chief Justice of the Supreme Court to receive applications for, and to enter, orders authorizing interceptions of wire, electronic or oral communications pursuant to this act[.]

Family Part judges because they possess "special jurisdiction and expertise in family matters"); State v. Harris, 466 N.J. Super. 502, 549 (App. Div. 2021) (according comparable deference to the findings made by Drug Court judges "in view of their expertise in addressing 'the unique problems and needs posed by non-violent, drug-dependent offenders'") (internal citations omitted)).

In this instance, we conclude—with respect to the calls the trial court analyzed and definitively ruled on—that the trial court properly accounted for all appropriate factors and circumstances under the Catania/Scott analytical paradigm, including: the instructions given to the monitors; the expansive nature of the drug distribution conspiracy and the large number of suspected co-conspirators; the timing of the calls in relation to the ongoing wiretap investigation; the established pattern and practice of the targets mixing personal and criminal business in their conversations; the duration of the disputed calls; the proportion of those calls that were minimized; the number of times those calls were turned off and on again; and the percentage of non-monitored call time. We therefore affirm the trial court's decision with two caveats.

First, we note the trial court's conclusion that the monitoring of call #1,117 was not unreasonable was contingent upon the court receiving

38

additional information from the State. The content of that call focused on intimate sexual relations, which unquestionably fall within the heartland of the privacy concerns expressed in the Wiretap Act as well as Catania and its progeny. Specifically, the trial court's written opinion reads:

> Call #1[,]117 – 3/18/2013: [Two] minutes [nineteen] seconds. Call deemed non-pertinent. It was not minimized. Tyquan Fuqua speaks to "SB" regarding sex. Defense argues this is a personal call. It is not the State's business. Furthermore, this was weeks into the wiretap. The State argues that SB was a co-conspirator who ultimately was stopped on the New Jersey Turnpike with Tyquan Fuqua with 12,000 bags of [h]eroin. Additionally, the State has other calls regarding the two individuals where they discuss personal issues and drugs in the same call. The [c]ourt finds the call should have been stopped and/or monitored. The nature of the call early on was all sexual in nature. The call is somewhat short in duration. Clearly, the parties are discussing a personal relationship. If the State has another call before March 18, 2013, where the parties discuss criminal activity, then the [c]ourt would be of the mindset that listening to the call would not have been unreasonable. [The court] ask[s] the State to provide this information to the [c]ourt within [ten] days.

> [(emphasis added).]

The record before us does not indicate whether the State provided the requested information concerning earlier intercepted calls in which the participants discussed both personal matters and CDS-related matters. Nor did

39

the trial court issue a revised or supplemental opinion accounting for any such additional information. We therefore are constrained to remand the matter for the trial court to make additional findings, as appropriate, and to issue a definitive ruling whether the failure to minimize this call constitutes a violation of the Wiretap Act. If the State has not already supplied the information requested in the trial court's written opinion, we leave to the discretion of the trial court as to the manner by which the State shall provide that information to the court and defense counsel. We also leave to the trial court's discretion whether to require or accept additional submissions from the parties or to convene a new oral argument.

Second, defendant Tyquan Fuqua identifies on appeal five calls that were played back during the suppression hearing but were not addressed in the court's written opinion. Specifically, the trial court did not make findings of fact and law with respect to the following disputed calls: #46 (March 15, 2013); #514 (March 9, 2013); #523 (March 9, 2013); #11,895 (March 25, 2013); and #12,029 (March 26, 2013).

In this we decline to exercise original jurisdiction. See Tomaino v. Burman, 364 N.J. Super. 224, 234–35 (App. Div. 2003) ("Our original factfinding authority must be exercised only 'with great frugality and in none

but a clear case free of doubt.'") (quoting <u>In re Boardwalk Regency Corp.</u> <u>Casino License Application</u>, 180 N.J. Super. 324, 334 (App. Div. 1981)). Instead, we remand the matter for the trial court to make findings of fact and law with respect to these five calls, comparable in detail to the findings the court made with respect to the other calls analyzed in its written decision.

We offer no opinion whatsoever on whether the State violated the Wiretap Act's minimization requirement with respect to any of these five calls. We leave to the discretion of the trial court whether to convene a new evidentiary hearing or oral argument to resolve factual or legal disputes concerning these calls. To facilitate the trial court's analysis on remand, we direct the parties to provide the court with their appellate submissions pertaining to these five calls if they have not already done so.

If the trial court on remand determines the Wiretap Act was violated, it shall invoke the exclusionary remedy as required under <u>Catania</u>, 85 N.J. at 426, and shall vacate the defendants' guilty pleas.

D.

Finally, with respect to the alleged violations of the Wiretap Act, we turn to defendants Derek and Tyquan Fuqua's contention the wiretap recordings were not sealed in accordance with N.J.S.A. 2A:156A-14, thus

41

requiring their suppression.[14]  On April 3, 2013—the same day the wiretap authorization order expired—the State took the recordings and associated papers to the Assignment Judge to be sealed.  The judge instructed the State to come back on April 9, 2013, at which time the recordings were sealed. Defendants subsequently moved to suppress the recordings, arguing the six-day delay[15] violated N.J.S.A. 2A:156A-14.  Defendants appeal from the trial court's March 16, 2016 oral opinion denying the motion on the grounds that the State provided a satisfactory explanation for the delay.[16]  We affirm substantially for the reasons set forth in the trial court's oral opinion.  We add the following comments.

---

[14]  Defendants Thomas and Virgil did not raise this issue on appeal.

[15]  We note that only four of those days were business days.

[16]  We granted defendant Derek Fuqua's motion for leave to file a pro se reply brief after this matter was submitted.  The pro se reply brief raises new arguments regarding the sealing delay that were not addressed in his counsel's merits brief or his own pro se supplemental merits brief.  He argues, for example, it is "incredulous" that the Assignment Judge could direct the State to return on a later date to seal the records and yet grant an extension of the wiretap authorization during that time period.

"It is well-settled that introduction of a new issue by way of a reply brief is improper."  Musto v. Vidas, 333 N.J. Super. 52, 69 (App. Div. 2000); see also State v. Smith, 55 N.J. 476, 488 (1970); Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 2:6-5 (2021).  In any event, defendant's newly raised arguments lack sufficient merit to warrant discussion in this opinion.  R. 2:11-3(e)(2).

N.J.S.A. 2A:156A-14 provides in pertinent part:

> Immediately upon the expiration of the [wiretap authorization] order or extensions or renewals thereof, the tapes, wires[,] or other recordings shall be transferred to the judge issuing the order and sealed under [his or her] direction. . . . The presence of the seal provided by this section, or a satisfactory explanation for its absence, shall be a prerequisite for the disclosure of the contents of any wire, electronic or oral communication, or evidence derived therefrom
> . . . .
>
> [(emphasis added).]

In State v. Cerbo, the Court held that "[s]ince the delay in sealing is tantamount to the absence of a seal under N.J.S.A. 2A:156A-14, the statutory requirement that there be a satisfactory explanation for such 'absence' is applicable to the delay in sealing." 78 N.J. 595 (1979). As the plain language of N.J.S.A. 2A:156A-14 makes clear, wiretap recordings are not automatically suppressed when they are not sealed "immediately." Rather, the failure to immediately seal the records can be excused, provided there is a satisfactory explanation. The plain text also makes clear that sealing is done "under the [judge's] direction."

In this instance, the gravamen of the State's argument is not that a wiretap judge was unavailable. Rather, the State argues it was justified in

43

complying with the directions given by the Assignment Judge who issued the original wiretap authorization order.

We believe the State was not obliged to disregard the Assignment Judge's unambiguous instruction and find another judge authorized to seal the recordings. We agree with the trial court that the State's dutiful compliance with the Assignment Judge's explicit direction was appropriate and constitutes a satisfactory explanation for the delay in sealing the recordings. We note that another provision of the Wiretap Act relating to sealing provides in pertinent part:

> Applications made and orders granted pursuant to this act and supporting papers shall be sealed by the court and shall be held in custody as the court shall direct and shall not be destroyed except on order of the court and in any event shall be kept for 10 years. They may be disclosed only upon a showing of good cause before a court of competent jurisdiction.
>
> [N.J.S.A. 2A:156A-15 (emphasis added).]

This provision—which pertains to the safekeeping of wiretap records after they are sealed—also expressly recognizes the authority of the wiretap judge to direct how confidential wiretap-related records are to be held by the State.

We add that defendants' reliance on our decision in State v. Barisse 173 N.J. Super. 549 (App. Div. 1980), aff'd sub. nom. State v. Burstein, 85 N.J.

394 (1981), is misplaced. We commented in <u>Barisse</u>, "sealing can be, and in the absence of the availability of the issuing judge[,] must be[] obtained from another judge." 173 N.J. Super. at 551. However, the formulation of that principle was tempered by the Supreme Court in <u>Burstein</u>, which explained the sealing statute "should henceforth be construed so as <u>to allow</u> the tapes to be sealed by any authorized judge when the judge who issued the order is unavailable. . . ." 85 N.J. at 402 n.2 (emphasis added).

We do not read the Supreme Court's reformulation in <u>Burstein</u> to require the State find another wiretap judge in contravention of a direct instruction by the Assignment Judge to return with the recordings for sealing at a later date. We thus conclude it was objectively reasonable for the State to comply with and rely on the Assignment's Judge's specific direction. <u>Cf.</u> <u>United States v. Ojeda Rios</u>, 495 U.S. 257, 266 (1990) (explaining that to establish a "satisfactory explanation" under the analogous provision of the federal wiretap statute, the prosecutor "is not required to prove that a particular understanding of the law is correct but rather only that its interpretation was objectively reasonable at the time").

We also agree with the trial court that in this instance, there was only a minor delay in sealing the wiretap recordings and that there is no suggestion

the recordings were tampered with while in the State's custody prior to their sealing by the court. We note that federal cases have permitted significantly longer delays in sealing wiretap records under the analogous federal statute. See e.g. United States v. Pedroni, 958 F.2d 262, 265 (9th Cir. 1992) (admitting recordings after fourteen-day delay); United States v. Lawson, 545 F.2d 557, 564–65 (7th Cir. 1975) (admitting recordings after fifty-seven-day delay); see also Ates, 217 N.J. at 269 ("Because the Wiretap Act is closely modeled after Title III [the federal wiretap law], we give careful consideration to federal decisions interpreting the federal statute.") (citing In re Wire Commc'n, 76 N.J. 266, 262 (1978)).

## III.

We next address Thomas's contention the trial court erred in denying his motion to suppress CDS discovered during the search of a vehicle operated by co-defendant Eddie Wall[17] in which Thomas was a passenger. Thomas now argues the discovery of the CDS in the vehicle was the fruit of the unlawful deployment of a drug detection canine. We note this was not the legal theory that Thomas and Wall first argued before the Law Division judge. Rather, the gravamen of their argument initially was that the "directed" stop was unlawful

---

[17] Wall is not a party to this appeal.

because the detaining officers had not observed a motor vehicle violation and the stop was a pretext.[18] Thomas and Wall further argued the plain view seizure of the CDS on the floor was unlawful because the officers were not legitimately present at the moment they observed the CDS by reason of the unlawful stop. They likewise argued that but for the unlawful stop, the officers would not have noticed an apparent trap door indicating a hidden

---

[18] The term "directed stop" refers to a planned investigative detention where uniformed patrol officers simulate a spontaneous motor vehicle stop for a traffic infraction under Delaware v. Prouse, 440 U.S. 648 (1979). This is done so that the vehicle occupants are not alerted to the fact that they are the subjects of an ongoing criminal investigation.

Although such motor vehicle encounters are pretextual, they are not unlawful—even when a motor vehicle infraction is not committed—so long as there is reasonable articulable suspicion to believe a vehicle occupant is involved in unlawful activity to justify an investigative detention under Terry v. Ohio, 392 U.S. 1 (1968). See Whren v. United States, 517 U.S. 806, 813 (1996) (holding reasonableness of stop does not depend on subjective motivations of officer and permitting police to investigate criminal activity under the guise of enforcing traffic laws); State v. Bruzzese, 94 N.J. 210, 219 (1983) ("We hold that the proper inquiry for determining the constitutionality of a search-and-seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable, without regard to his or her underlying motives or intent."); see also United States v. Hensley, 469 U.S. 221 (1985) (recognizing a collective law enforcement knowledge doctrine that permits an officer to act on the basis of information provided by another officer or bulletin).

Thomas does not contend on appeal the stop was unlawful on this ground and thus has abandoned the "pretext stop" argument. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived.").

A-3149-17

compartment. Accordingly, they argued the ensuing search warrant was a fruit of the unlawful stop.

Thomas and Wall did not initially contend their rights were violated by the manner in which the dog inspected the vehicle. Regarding that examination, Thomas in his Law Division brief merely stated, "[t]he officers present at the scene requested the assistance of a narcotics canine and Officer D. Williams arrived on the scene with his canine partner Samu who allegedly gave a positive indication on the right interior portion of the vehicle." Thomas's Law Division brief contained no further mention of the canine inspection nor did it offer any legal argument claiming the use of the canine was improper. As we next explain, the contention that the canine unlawfully entered the vehicle emerged well after the suppression hearing was completed.

The suppression hearing was conducted over the course of two days on May 18 and June 13, 2015. We briefly summarize the pertinent facts.

On March 18, 2013, State Police intercepted a text message from Thomas to Derek Fuqua requesting a "dollar and a half." State Police interpreted that to be a request to purchase heroin. Later that day, State Police conducted a visual surveillance of Derek Fuqua's residence. They observed Thomas and Wall arrive in a Dodge Caravan and meet with Fuqua. Fuqua

48

removed a bag from the trunk of a Chevrolet Camaro. Thomas and Fuqua then entered the Camaro. After a short time, Thomas exited the Camaro holding something against his body, which the surveilling officers believed to be the bag that Fuqua had removed from the trunk of the Camaro. Thomas entered the Caravan and sat in the passenger seat. The Caravan then drove off. State Police contacted the Jersey City Police Department (JCPD) and instructed them to conduct a directed stop of the Dodge Caravan, informing them that the vehicle's occupants were suspected of engaging in a CDS transaction and that Thomas had active arrest warrants.

As instructed, JCPD officers stopped the Caravan, telling the occupants the reason for the stop was failure to obey a traffic light. The driver of the Caravan, Wall, was unable to produce a valid New Jersey vehicle registration. The officers checked the automated traffic system and confirmed that Thomas had several active traffic warrants. He was placed under arrest. As the officers were removing Thomas from the vehicle, they observed a glassine bag on the floor between the front and back seats. The glassine bag was labeled "Jumping Jack" and based on their training and experience, the officers believed it to contain heroin. The officers also noticed aftermarket

modifications to the vehicle consistent with the installation of a trap door, indicating a hidden compartment.

The officers requested the assistance of a narcotics detection canine.[19] The dog alerted to the presence of CDS in the vehicle. The minivan was then transported to JCPD headquarters and police obtained a search warrant. The ensuing search of the minivan recovered a clear bag containing approximately 200 grams of unpackaged heroin along with 100 individually wrapped bags of suspected heroin in the hidden compartment.

Importantly for purposes of this appeal, the testimony elicited at the suppression hearing concerning the dog's examination of the vehicle is sparse, reflecting that the defense argument at the time of the suppression hearing did not challenge the lawfulness of the canine sniff. JCPD Lieutenant Anthony Musante testified on direct examination that the "canine indicated on the passenger side of the vehicle the presence of narcotics."

On cross-examination, Wall's counsel queried the lieutenant as follows:

| Defense Counsel: | So, a drug dog is brought down to the location, and the drug dog, basically, goes around the vehicle, in the vehicle, |
|---|---|

---

[19] It is not clear from the limited record before us whether the officers summoned the canine to make it appear the encounter was an unplanned traffic stop during which the officers' suspicions arose spontaneously. See supra note 18.

|  |  |
|---|---|
| | and ultimately hits on an area on the right interior portion of the vehicle, correct? |
| Lieutenant Musante: | Correct. |
| Defense Counsel: | And it's at that point, based upon the hit being made, that what happens? |
| Lieutenant Musante: | That we apply for a search warrant. |
| Defense Counsel: | And the warrant then is based upon the motor vehicle stop, the plain view observation, and this hit by the drug dog when he's—goes to the interior portion of the car, and supposedly indicates that there's a potential[—]that there's something concealed in the car? |
| Lieutenant Musante: | That is correct. |

JCPD Officer Joseph Anzivino also testified at the suppression hearing. His account of the canine inspection was even less detailed. He testified that they requested a canine response unit and that "[t]he canine . . . was trained in narcotics detection. He indicated that there was a positive indication of CDS in the vehicle, at which point we secured the vehicle and took it back to [police headquarters], and I prepared a search warrant."

The dog's handler did not testify.

A-3149-17

The trial court did not rule immediately. On June 23, 2015—twenty days after the conclusion of the suppression hearing—Wall filed a supplemental letter-brief arguing for the first time that the evidence seized from the hidden compartment must be suppressed based on Lieutenant Musante's testimony that suggests the dog at some point entered the vehicle. Wall argued the dog's warrantless entry of the minivan was an unconstitutional search. Thomas did not file a supplemental motion brief and did not join Wall's brief.

On October 22, 2015, the trial court rendered a written opinion denying defendants' joint suppression motion. The trial court found the manner in which police used the canine was unconstitutional. While recognizing that police may use a drug detection dog to examine the outside of a vehicle without a warrant or probable cause, the court reasoned—correctly, in our view—the canine could not be used to inspect the interior of the vehicle without first obtaining a search warrant or consent unless exigent circumstances excused the failure to obtain a warrant. With respect to factual findings, the court stated that it was "not persuaded that the canine's search was limited only to the exterior of the defendants' vehicle." To support this finding, the court relied on Lieutenant Musante's brief affirmative responses

when he was asked on cross-examination whether the canine searched "in the vehicle" and whether the dog went "to the interior portion of the car."

The trial court further concluded that there were no exigent circumstances that excused the failure to obtain a warrant before allowing the dog to inspect the interior of the vehicle. The court reasoned that Wall and Thomas had already been arrested and the glassine bag observed in plain view on the floor of the vehicle had already been confiscated. The court found there were no other exigent circumstances to justify an immediate roadside search of the vehicle.

Based on these findings, the court concluded the canine was improperly used to perform a search of the interior of the vehicle and therefore the dog's positive alert to CDS was a fruit of the unlawful entry. Noting the dog sniff was used in conjunction with other evidence in support of the search warrant application, the court nonetheless sustained the warrant, citing to State v. Ortense, 171 N.J. Super. 453 (App. Div. 1980), for the proposition that "if the supporting affidavit contains information both lawfully and unlawfully obtained and the lawfully obtained information is adequate to establish probable cause, the warrant will be deemed properly issued." The court

53

determined that the other facts included in the warrant affidavit were sufficient to establish probable cause to believe CDS was concealed in the vehicle.

Specifically, the court found independent probable cause based on the officers' training in narcotics detection, their plain view observation of the glassine bag containing suspected heroin, and their observation of aftermarket modifications to the Caravan indicating the presence of a hidden "trap door" compartment. The court concluded those circumstances provided a sufficient independent basis upon which to sustain the validity of the search warrant. The court thereupon denied the motion to suppress.

Thomas and the State take issue with different portions of the trial court's opinion. Thomas argues the court did not address all of the elements of the independent source doctrine spelled out by our Supreme Court in Holland. The State does not dispute the trial court did not complete the three-prong independent source analysis required by Holland but argues resort to that exception to the exclusionary rule is unnecessary because the canine inspection was lawful.

### A.

We first address the State's contention that the trial court erred in finding that the canine inspection of the Caravan was unlawful. In United States v.

Place, the United State Supreme Court held that a canine sniff does not constitute a "search" within the meaning of the Fourth Amendment. 462 U.S. 696, 706–07 (1983). The Court characterized canine sniffs as sui generis because they do not reveal noncontraband items. Id. at 707.

Place involved the use of a drug detection canine to inspect the defendant's luggage at an airport. In Indianapolis v. Edmond, the Court applied the same rationale to the scent examination of a vehicle, reiterating that a canine sniff "is not designed to disclose any information other than the presence or absence of narcotics." 531 U.S. 32, 40 (2000). The Court also recognized that the sniff "does not require entry into the car." Ibid. In other words, a positive alert from a canine sniff made from outside a vehicle can support the inference that CDS is contained within the vehicle. The dog thus does not have to enter the vehicle to establish probable cause to believe that CDS is concealed within. See Florida v. Harris, 568 U.S. 237, 246–47 (2013) (holding that a drug detection canine's sniff of a vehicle's exterior and alert provides probable cause to believe it contained illegal drugs, when the canine either has been formally certified as reliable or has recently successfully completed a training program testing its proficiency in locating drugs).

A-3149-17

In Illinois v. Caballes, 543 U.S. 405 (2005), the Court provided further guidance on the use of drug detection canines deployed to the scene of a motor vehicle stop. The Court held "a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed [upon the defendant's] constitutionally protected interest in privacy." Id. at 408 (emphasis added). The Court concluded that the canine sniff of the exterior of the vehicle did not infringe upon the defendant's privacy interests. Id. at 408–10. The Court thus made clear that the officers did not need reasonable suspicion, much less probable cause, to believe the defendant was engaged in narcotics trafficking before they could subject a vehicle to a canine sniff. Id. at 408.

The New Jersey Supreme Court has since embraced the United States Supreme Court's rationale that canine sniffs do not constitute a search. In State v. Dunbar, our Court

> endorse[d] the federal determination that a canine sniff is sui generis and does not transform an otherwise lawful seizure into a search that triggers constitutional protections.[] Place, . . . 462 U.S. at 706–07; Edmond, . . . 531 U.S. at 40. Canine sniffs do not involve the unveiling of noncontraband items that would otherwise remain unexposed to public view and signal only the presence or absence of illegal items. Place, . . . 462 U.S. at 707. Canine sniffs

56

therefore constitute a unique procedure that is less intrusive than a search.

[229 N.J. 521, 539 (2017).]

The Dunbar Court also expressly adopted "the federal standard for determining the manner in which an officer may conduct a canine sniff during an otherwise lawful traffic stop." Ibid. Specifically, the Court held that an officer in this State "does not need reasonable suspicion independent from the justification for a traffic stop in order to conduct a canine sniff." Ibid. (citing Caballes, 543 U.S. at 408).

We emphasize, however, that this legal principle applies only to a canine sniff of the exterior of a vehicle. A canine sniff conducted while inside a detained vehicle raises constitutional concern, not because the sniff can reveal noncontraband belongings, but rather because any law enforcement incursion into a protected space constitutes a privacy intrusion for purposes of the Fourth Amendment and Article I, paragraph 7 of the New Jersey Constitution. See Caballes, 543 U.S. at 408 (recognizing any official conduct, including a dog sniff, would be problematic if it were to infringe upon a constitutionally protected privacy interest); Edmond, 531 U.S. at 40 (noting a canine sniff "does not require entry into the car.").

57

Accordingly, although a drug detection canine sniff is not deemed to be a traditional search because it can only reveal the presence of contraband, Caballes, 543 U.S. at 409, the canine must be lawfully present at the moment of its scent inspection. Cf. Horton v. California, 496 U.S. 128, 137 (1990) (explaining that for the plain view/sense doctrine to apply, "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself."). In sum, whether labeled a "search" or not, a dog's physical entry into a lawfully detained vehicle for the purpose of conducting a sniff inspection constitutes a privacy intrusion that triggers the probable cause and warrant requirements.[20]

We next consider the legal standards governing when police may enter a vehicle for investigative purposes without first obtaining a warrant. It is well-

---

[20] We note that not all police entries into a vehicle to inspect for concealed objects require probable cause and a warrant or warrant exception. The so-called "vehicle frisk" doctrine allows police to enter the passenger cabin of a vehicle to conduct a limited inspection for weapons based on reasonable articulable suspicion rather than probable cause. See State v. Gamble, 218 N.J. 412 (2014). That doctrine does not apply here. The State did not argue there was a basis for the officers to believe that weapons were present.

We add that entry by a drug-detection canine does not fall under the rubric of the vehicle frisk doctrine because an alert would not signal the presence of weapons. We offer no opinion on whether a police canine trained to detect firearms, ammunition, or explosives might be used to facilitate a vehicle frisk for weapons.

A-3149-17

established that warrantless searches and seizures are "presumptively invalid"; thus, "the State bears the burden of proving "by a preponderance of the evidence that a warrantless search or seizure falls within one of the few well-delineated exceptions to the warrant requirement." State v. Mann, 203 N.J. 328, 337–38 (2010) (quoting Elders, 192 N.J. at 246).

Applying that foundational principle to the present context, we believe that absent consent, a warrantless drug detection canine sniff of the interior of a vehicle—that is, an examination that entails the canine entering the vehicle—must satisfy the elements of the automobile exception to the warrant requirement. Otherwise, the warrantless police entry into the vehicle for investigative purposes would be unlawful, rendering a positive canine alert inadmissible as a fruit of the unlawful entry.

In State v. Pena-Flores, our Supreme Court held that the automobile exception under the New Jersey Constitution required the State to prove exigent circumstances that would make it impracticable to obtain a warrant. 198 N.J. 6, 11, 28 (2009). Six years after Pena-Flores was decided, the Court reversed course in State v. Witt, 223 N.J. 409 (2015), displacing the Pena-Flores exigency test. The rule announced in Witt authorizes an automobile exception search if (1) police have probable cause to believe the vehicle

contains contraband or evidence of an offense, and (2) the circumstances giving rise to probable cause are unforeseeable and spontaneous.  Id. at 447.  However, the Witt reformulation of the automobile exception applies only prospectively, that is, to searches conducted after Witt was decided on September 24, 2015.  Id. at 449–50.  In the case before us, the vehicle stop and ensuing search occurred before Witt was decided.  Accordingly, under the Pena-Flores formulation that was then in force, police could not enter the Caravan to advance their investigation absent exigent circumstances, which, as the trial court correctly found, did not exist in this case.

The State urges us to follow a line of federal cases holding that a canine's entry of a vehicle to examine its interior does not constitute a privacy intrusion for purposes of constitutional analysis unless the dog was directed by the police to enter the vehicle or unless officers encouraged or facilitated the dog's entry.  In United States v. Pierce, for example, the window of the detained vehicle was open, creating an opportunity for the dog to breach the interior.  622 F.3d 209, 212–14 (3d Cir. 2010).  The canine jumped through the open window and sniffed throughout the interior of the car.  Id. at 211–12.  The Third Circuit Court of Appeals held that because the dog entered the car

without prompting and was following its "natural migration from [its] initial exterior sniffs," the canine entry was not unlawful. Id. at 213–15.

That analytical approach, which we refer to as the "instinctive-reaction" principle, has been adopted by other federal appellate courts. See United States v. Sharp, 689 F.3d 616, 619–620 (6th Cir. 2012) (holding "a trained canine's sniff inside of a car after instinctively jumping into the car is not a search that violates the Fourth Amendment as long as the police did not encourage or facilitate the dog's jump"); United States v. Lyons, 486 F.3d 367, 373 (8th Cir. 2007) ("Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment."); United States v. Stone, 866 F.2d 359, 364 (10th Cir. 1989) ("dog's instinctive actions did not violate the Fourth Amendment"); United States v. Vasquez, 555 F.3d 923, 930 (10th Cir. 2009) ("[W]e have upheld the legality of such a sniff during a lawful detention when . . . (1) the dog's leap into the car was instinctual rather than orchestrated[,] and (2) the officers did not ask the driver to open the point of entry . . . used by the dog."); cf. United States v. Pulido-Ayala, 892 F.3d 315, 319–20 (8th Cir. 2018) (holding if a dog's access to a car's interior is facilitated by the conduct of the driver or passenger leaving the door open, officers have no obligation to then close the door and the ensuing entry is not

61

unlawful); United States v. Winnington, 140 F.3d 1328, 1331 (10th Cir. 1998) (holding canine sniff became a search in violation of Fourth Amendment when "the officers themselves opened the door" and "facilitate[d] a dog sniff of the van's interior") (emphasis added).

The record as it presently stands does not support the State's reliance on these federal decisions because no information was elicited at the suppression hearing concerning many of the circumstances deemed to be relevant in those cases. For example, it is not clear from the present record whether: (1) the dog first examined the Caravan's exterior and whether it alerted to the presence of CDS before entering the vehicle; (2) the dog entered the vehicle via an open window or door; (3) the door or window had been opened by an occupant, or by police, and for what purpose; (4) the door or window was left open by an occupant, or by an officer; (5) the dog jumped completely into the vehicle or whether only its head/nose broke the plane of the vehicle interior in the course of conducting an exterior sniff;[21] or (6) the dog's entry was on the command of

---

[21] We surmise that a police handler would be able to exercise greater control in preventing his or her canine partner from fully entering a vehicle than in preventing the dog from briefly poking its nose partially into a vehicle through an open door or window in the course of conducting an otherwise lawful exterior examination. The latter circumstance might present a less intrusive— if not minimally intrusive—physical incursion for purposes of determining the objective reasonableness of the handler's conduct. Cf. State v. Mandel, 455

A-3149-17

or was facilitated by the handler, or instead was an instinctive reaction by the animal.

Given the dearth of information elicited at the suppression hearing regarding the circumstances of the canine sniff, we decline to issue what essentially would be an advisory opinion based more on speculation than on well-supported factual findings by the trial court. We thus offer no opinion on whether, under the New Jersey Constitution, [22] a drug detection canine is

---

N.J. Super. 109, 115 (App. Div. 2018) ("[It is not clear] whether an officer conducts a search by momentarily placing his head into an open car window. In New Jersey, no reported case appears to address this question. However, other courts that have ruled on the issue have generally held this 'constitute[s] a "search" for Fourth Amendment purposes.'" (internal citations omitted)). So too we might consider it relevant whether the handler took steps to remedy an unauthorized instinctive entry by ordering the dog to exit the vehicle immediately.

To ensure a proper record is created to address the State's novel legal argument, we deem it appropriate for the trial court to make specific findings concerning the degree to which the dog entered the vehicle, the length of time it was inside, and the role the handler played not only in facilitating the incursion, but also in minimizing/remediating an instinctive incursion.

[22] As we have noted, in <u>Dunbar</u>, our Supreme Court "adopt[ed] the federal standard for determining the manner in which an officer may conduct a canine sniff during an otherwise lawful traffic stop." 229 N.J. at 539. We do not interpret that statement to mean that the Court tacitly embraced all federal precedents pertaining to canine sniffs, including the opinions of various Circuit Courts of Appeals accepting the instinctive-reaction principle. Rather, we believe the Court would carefully scrutinize that body of caselaw to determine whether the instinctive-reaction principle is fully consonant with the interests embodied in Article I, Paragraph 7 of our State Constitution. As the Court noted in <u>Witt</u>, "[w]e have not hesitated to find that our State Constitution

deemed to be a law enforcement instrumentality such that its physical intrusion into a constitutionally protected space, whether instinctive or not, constitutes police action attributable to its human partner, thus requiring a warrant or warrant exception.

We emphasize that in this instance—as is often the case—the outcome of the search-and-seizure contest requires analytical precision that in turn depends on a record that nails down the precise nature, timing, and sequence of all constitutionally significant events. The careful review of police actions and decisions requires a painstaking step-by-step analysis that identifies precisely (1) when a Fourth Amendment liberty or privacy intrusion occurs; (2) the legal standard triggered by that intrusion (e.g., reasonable suspicion, probable cause, the warrant requirement, etc.); and (3) whether the liberty or privacy intrusion was justified at the moment it occurred, applying the governing legal standard to the totality of the circumstances known to police at that moment.

---

provides [New Jersey] citizens with greater rights . . . than those available under the United States Constitution." 223 N.J. at 409 (citing Lewis v. Harris, 188 N.J. 415, 456 (2006)). Accord State v. Carter, __ N.J. __, __ (2021) (slip op. at 40) ("On a number of occasions, this Court has found that the New Jersey Constitution 'affords our citizens greater protection against unreasonable searches and seizures' than the Fourth Amendment does." (internal citations omitted)).

64

That leads us to the State's contentions regarding the sparse record concerning the circumstances of the canine sniff. As we have noted, as a general rule, the State bears the burden of justifying a warrantless search or seizure. See Mann, 203 N.J. at 337–38; see also State v. Pineiro, 181 N.J. 13, 19 (2004) (recognizing a warrantless search or seizure is presumed invalid and the State as the party seeking to validate a warrantless search has the burden of proving its validity). The State nonetheless argues that it should not bear the burden of establishing that the procedures used during the canine sniff were constitutionally adequate because the issue was not raised before or during the suppression hearing. The State cites Witt for the proposition that it should not bear the burden of proving the lawfulness of the canine sniff because it was not given notice of the need to elicit more fulsome testimony.

In Witt, the Court rejected the defendant's challenge to the lawfulness of a stop because the defendant "did not challenge the validity of the motor-vehicle stop . . . in either his brief or argument before the trial court." 223 N.J. at 418. Rather, the challenge to the stop was raised for the first time on appeal. Ibid. In rejecting the defendant's unlawful stop contention, the Court rejected the suggestion that "the State [be required to] disprove issues not raised by the defense at a suppression hearing," as such a holding "would

compel the State to cover areas not in dispute from fear that an abbreviated record will leave it vulnerable if the defense raises issues for the first time on appeal," thus needlessly lengthening the suppression hearing process. Ibid. Accordingly, because the State in Witt was "deprived of the opportunity to establish a record that might have resolved the issue through a few questions," the Court held that the lawfulness of the stop in that case had not been preserved for appellate review. Id. at 418–19.

We note that in this instance, in contrast to Witt, the newly-minted defense legal theory was not raised for the first time on appeal. Co-defendant Wall raised the canine sniff argument to the trial court, but only after the suppression hearing had wrapped up. Because the trial court ruled on the canine sniff issue, moreover, we are permitted—indeed, obliged—to review the court's suppression ruling in its entirety. Certainly, Thomas is not procedurally barred in these circumstances from asserting on appeal that the trial court correctly ruled that the canine sniff was unlawful. Cf. Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 2:6-2 (2021) (noting that appellate courts may consider arguments so long as the "issue was raised in the trial court even if [the] argument before the trial court was based on a different theory from that advanced in the appellate court"). Nor does this unusual

procedural posture require us to apply the plain error standard of review to defendant's contention. See R. 2:10-2 (permitting an appellate court to review an issue not raised below applying the plain error standard). Here, the issue was raised below—albeit belatedly—and was ruled upon by the trial court.

Though we do not agree that the State bears no burden in proving the lawfulness of the canine sniff, we do concur with the State's argument that the failure to raise the dog sniff issue until after the evidentiary hearing was completed "deprived [the State] of the opportunity to establish a record that might have resolved the issue through a few questions." Witt, 223 N.J. at 418–19; see also State v. Robinson, 200 N.J. 1, 21 (2009) ("[T]he failure to raise defendant's present claim during the motion to suppress denied the State the opportunity to confront the claim head-on; it denied the trial court the opportunity to evaluate the claim in an informed and deliberate manner; and it denied any reviewing court the benefit of a robust record within which the claim could be considered.")

As we have noted, our deference to a trial court's factual findings at a motion to suppress presupposes those findings are supported by sufficient credible evidence in the record. Evans, 235 N.J. at 133; Robinson, 200 N.J. at 15. Furthermore, we are not bound in any event by a trial court's

interpretations of the legal consequences that flow from established facts.  See Manalapan, 140 N.J. at 378.

In this instance, we believe the abbreviated record is inadequate to support the trial court's conclusion that the canine sniff was unlawful.  By way of example, the trial court in its written decision commented that it was "not persuaded that the canine's search was limited to the exterior of the defendant's vehicle."  That is not a definitive finding that the canine did not first examine the exterior of the vehicle and signal the presence of CDS before entering the vehicle.  Indeed, the court's phraseology could be read to imply that there had been an exterior canine sniff that was followed by an interior sniff.  Moreover, Lieutenant Musante's affirmative response to counsel's question that the dog "goes around the vehicle" and "ultimately hits" does not preclude a finding that the dog first examined the exterior of the Caravan and alerted to the presence of CDS before entering the vehicle.  If the dog alerted while still outside the vehicle, that alert would not be subject to the exclusionary rule and could be considered in determining whether there was probable cause to believe there was CDS in the vehicle, see Harris, 568 U.S. at 246–47, thus rendering any subsequent alert made by the dog from inside the vehicle redundant for purposes of the warrant application.

68

We decline to speculate on what actually happened during the directed stop with respect to the deployment of the canine. Nor are we prepared to exercise original jurisdiction to fill in the gaps in the record. See R. 2:10-5; Tomaino, 364 N.J. Super. at 234–35 ("Our original factfinding authority must be exercised 'with great frugality and in none but a clear case free of doubt.'") (quoting In re Boardwalk Regency Corp. Casino License, 180 N.J. Super. 324, 334 (App. Div. 1981).

We therefore remand for the trial court to convene a new suppression hearing to supplement the abbreviated record unless the parties agree to stipulate to the relevant facts concerning the canine scent examination. We instruct the trial court to make specific factual findings about the dog's movements and behaviors both inside and outside the vehicle, and to address whether the canine's positive alert was the fruit of an unlawful incursion. We further instruct the trial court to make findings concerning the circumstances that were deemed to be relevant in the federal dog sniff cases cited by the State (e.g., whether the dog's entry was directed or in any way facilitated by its handler or other officers, or was instead purely instinctive.) See also infra note 24. Although we do not retain jurisdiction, we instruct the trial court to make its findings of fact and conclusions of law with respect to the use of the drug

A-3149-17

detection canine in sufficient detail to facilitate appellate review, should that be required.

B.

We turn next to Thomas's contention that the trial court did not consider and make findings concerning each prong of the independent source doctrine as required under State v. Holland, 176 N.J. 344 (2001). In Holland, the Court recognized an exception to the general rule long established in Wong Sun[23] that evidence found after a constitutional violation must be suppressed. 176 N.J. at 360–61. To invoke the independent source exception to the exclusionary rule,

> [f]irst, the State must demonstrate that probable cause existed to conduct the challenged search without the unlawfully obtained information. It must make that showing by relying on factors wholly independent from the knowledge, evidence, or other information acquired as a result of the prior illegal search. Second, the State must demonstrate in accordance with an elevated standard of proof, namely, by clear and convincing evidence, that the police would have sought a warrant without the tainted knowledge or evidence that they previously had acquired or viewed. Third, regardless of the strength of their proofs under the first and second prongs, prosecutors must demonstrate by the same enhanced standard that the

---

[23] Wong Sun v. United States, 371 U.S. 471, 484–88 (1963) (holding the exclusionary rule extends to the direct and indirect products of unlawful police conduct, establishing the "fruit of the poisonous tree" doctrine).

initial impermissible search was not the product of flagrant police misconduct.

[Ibid.]

In this instance, the trial court determined that after excluding the canine's positive alert to CDS, the other information set forth in the warrant application was sufficient to establish probable cause. We agree and affirm that finding, which satisfies the first element of the Holland independent source test.[24] The State acknowledges, however, the trial court did not consider or make findings as to the two remaining elements of the three-part test. In these circumstances, we are constrained to remand for the trial court to complete the analytical process.

With respect to the second prong—whether the State would have sought a warrant without the tainted evidence—we note the circumstances might permit us to infer that the police would have applied for a warrant regardless of the result of the canine scent examination. Holland, 176 N.J. at 361. This was, after all, a directed stop following observation of an apparent drug

---

[24] We note that on remand pursuant to subsection III(A) of this opinion, if the trial court finds the dog alerted to the presence of CDS while still outside the vehicle, that finding would bolster the conclusion that police had probable cause to support the warrant independent of any positive canine alert made after an unlawful entry into the vehicle.

A-3149-17

transaction involving a person who was a target of an active wiretap investigation. See supra note 19.

The trial court aptly commented in its decision that "[i]mpoundment of the vehicle seemed inevitable." That comment does not, however, constitute a finding—applying the clear-and-convincing-evidence standard required in Holland—that JCPD officers would have applied for a search warrant even if the dog had not alerted to the presence of CDS. We again decline to exercise original jurisdiction and leave for the trial court on remand to make findings and conclusions regarding the second prong of the Holland independent source test.

With respect to the third prong, the judge made no finding as to whether the canine's positive alert was "the product of flagrant police misconduct." Id. at 361. We note that although the State bears the burden of proving the elements of the independent source doctrine by clear and convincing evidence, "[f]lagrancy is a high bar, requiring active disregard of proper procedure, or overt attempts to undermine constitutional protections." State v. Camey, 239 N.J. 282, 310 (2019) (citing State v. Smith, 212 N.J. 365, 398 (2012)). We leave for the trial court to decide in the first instance whether the use of the canine constitutes flagrant police misconduct.

We note the State argues on appeal that using the canine to inspect the interior of the vehicle cannot constitute a flagrant violation of defendant's constitutional rights because the Pena-Flores exigency test was replaced in Witt. We disagree with that argument for two distinct reasons.

First, it is by no means certain—indeed, doubtful—that police in this case would have been allowed to enter the vehicle to conduct a canine scent examination pursuant to Witt. The Court made clear in Witt that "if the circumstances giving rise to probable cause were foreseeable and not spontaneous, the warrant requirement applies." 223 N.J. at 448. In this instance, the encounter was a directed stop made at the request of the State Police based on an intercepted telephone conversation concerning CDS and the State Police observation of a suspected drug transaction just before Thomas entered the Caravan with the suspected contraband.

More fundamentally, we believe that under the independent source exception, flagrancy is measured by examining the manner in which police violated the law as it existed at the time of the police-citizen encounter. The Holland flagrancy prong does not invite reviewing courts to discount or minimize constitutional violations based on subsequent substantive revisions

to the constitutional standards governing police conduct.[25]  Any such argument ignores the fact that in <u>Witt</u>, the Court carefully considered and expressly eschewed the option to apply the less-restrictive spontaneity test retroactively. By leaving the <u>Pena-Flores</u> exigency test intact as to automobile searches conducted before <u>Witt</u> was decided, the Court clearly held that pre-<u>Witt</u> non-exigent automobile searches violated those defendants' constitutional rights, triggering the exclusionary rule.  <u>Id.</u> at 449.  Those constitutional violations are no less serious than violations that occur after <u>Witt</u> and require the same remedy.  The point simply is that police must follow search and seizure rules as they exist, not as they might become.  Just as an unreasonable intrusion is not validated or excused by what it fortuitously turns up, <u>see</u> <u>Bruzzese</u>, 94 N.J. at 221, police disregard of the search and seizure rules then in force is not made less flagrant by mere fortuity of subsequent changes to the law.  Rather, as we have already noted, flagrancy under the independent source doctrine is measured at the moment the police misconduct occurs.

---

[25]  We note this commonsense principle cuts both ways.  If police were to violate a new search and seizure rule that was given retroactive effect, the flagrancy of the misconduct for purposes of independent source analysis would be measured as of the moment the search or seizure was conducted.  Since police could not be expected to anticipate a new more restrictive rule, their violation of the new rule would not constitute flagrant misconduct provided they were complying with the law as it was then understood.

We leave to the trial court's discretion whether on remand to permit or require additional testimony, convene oral argument, or require the parties to submit additional materials with respect to the independent source exception. We add that to facilitate appellate review, should that be needed, the trial court shall make findings concerning the Holland independent source test even if it determines on remand pursuant to subsection III(A) of this opinion that the use of the canine was not unlawful.

IV.

We next address Virgil's contention the trial court abused its discretion in denying her motion to withdraw her guilty plea to conspiracy. The gravamen of her argument on appeal is that she did not expect to be ordered to perform fifty hours of community service as a condition of probation, even though the record shows she completed her community service before filing the motion to withdraw her guilty plea. Because we affirm the denial of her motion substantially for the reasons explained in the trial court's thorough and cogent oral opinion, we need not re-address defendant's arguments at length. We add the following comments.

The scope of our review is limited. We review a trial court's decision on a motion to withdraw a guilty plea for an abuse of discretion. See State v.

A-3149-17

O'Donnell, 435 N.J. Super. 351, 372 (App. Div. 2014). The "'denial of defendant's request to withdraw his [or her] guilty plea will be reversed on appeal only if . . . the [trial] court's decision [was] clearly erroneous.'" State v. Lipa, 219 N.J. 323, 332 (2014) (quoting State v. Simon, 161 N.J. 416, 444 (1999)).

In all plea withdrawal cases, whether evaluated under the "interests of justice" standard of Rule 3:9-3(e) for pre-sentencing motions, or the "manifest injustice" standard of Rule 3:21-1 for post-sentencing motions, "the burden rests on the defendant, in the first instance, to present some plausible basis for his [or her] request, and his [or her] good faith in asserting a defense on the merits." State v. Slater, 198 N.J. 145, 156 (2009) (quoting State v. Smullen, 118 N.J. 408, 416 (1990)).

The Court in Slater set forth a four-part test to evaluate a defendant's motion to withdraw a guilty plea:

> trial judges are to consider and balance four factors in evaluating motions to withdraw a guilty plea: (1) whether the defendant has asserted a colorable claim of innocence; (2) the nature and strength of defendant's reasons for withdrawal; (3) the existence of a plea bargain; and (4) whether withdrawal would result in unfair prejudice to the State or unfair advantage to the accused.
>
> [Id. at 157–58 (citation omitted).]

The Court added, "[a]nother important consideration is whether trial has begun. Once a jury has been chosen and sworn, and a plea interrupts the trial, withdrawal should only be permitted in the rarest of circumstances." Id. at 161.

The trial court in the matter before us carefully addressed the four enumerated factors, and also considered that defendant's guilty plea interrupted what would otherwise have been a lengthy racketeering trial.[26] We affirm the trial court's thorough and detailed findings with respect to each of the four Slater factors, which we need not recount in this opinion.

We add that Virgil's central argument is that the trial court violated her reasonable expectations by imposing fifty hours of community service as a condition of the three-year term of probation. We acknowledge that the negotiated plea agreement did not expressly mention the possibility of imposing community service as a condition of probation. Nor was the prospect of community service expressly mentioned during the plea colloquy. In State v. Saperstein, we held that when "[d]efendant accepted the possibility

_____

[26] We note the State's plea offer was contingent on the other trial co-defendants, Thomas and Styles, also pleading guilty. In these circumstances, the resource-conservation goal of the contingent plea arrangement would be eviscerated if defendant were allowed to withdraw her guilty plea and the case were to be remanded for her to stand trial alone. See Slater, 198 N.J. at 161.

A-3149-17

of a five[-]year custodial term[,] . . . imposition of 1,000 hours of community service cannot be said to have exceeded defendant's reasonable expectations." 202 N.J. Super. 478, 482 (App. Div. 1985). We further explained,

> We do not suggest that every obligation to be imposed as a condition of probation must be forecast and explained at the entry of the plea; many such obligations can fairly be said to be reasonably contemplated conditions of any probationary sentence. The [imposition of 1,000 hours of] community service discussed above is one example.
>
> [Id. at 483.]

So too in this case, we do not hesitate to conclude that the imposition of fifty hours of community service as a condition of a three-year period of probation did not violate Virgil's reasonable expectations and affords no basis upon which to allow her to withdraw her voluntary guilty plea.

## V.

Finally, we address Virgil's contention the trial court erred in denying her motion for a mistrial based on remarks made by the deputy attorney general in his opening argument to the jury. Specifically, while explaining to the jury why cutting or diluting agents are added to heroin, the deputy attorney general remarked, "[h]eroin ingested in its raw form is lethal. It can kill in just one dose." As we have already noted, the trial court found that comment was

78

inappropriate but declined to declare a mistrial. The court instead issued a curative instruction, making clear that there was no allegation in this case that anyone had been harmed and that the State's allegations were limited only to racketeering, conspiracy, and distribution of heroin. See State v. Smith, 224 N.J. 36, 47 (2016) (holding that whether an event at trial justifies a mistrial is a decision 'entrusted to the sound discretion of the trial court.'") (quoting State v. Harvey, 151 N.J. 117, 205 (1997)).

Virgil's contention on appeal lacks sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2). By pleading guilty, she waived all trial issues. See State v. Robinson, 224 N.J. Super. 495, 498 (App. Div. 1998) ("Generally, a guilty plea constitutes a waiver of all issues which were or could have been addressed by the trial judge before the guilty plea."). Indeed, Virgil acknowledges she did not preserve the mistrial issue for appellate review when she pled guilty. In contrast, at the plea hearing, she expressly reserved the right to challenge the trial court's wiretap ruling on appeal. We doubt the trial court and the State would have allowed a conditional plea preserving the right to appeal from the denial of the mistrial motion. See R. 3:9-3(f) (authorizing a conditional plea preserving the right to appeal non-search-and-seizure issues only with the approval of the court and the consent

of the prosecutor).  We are satisfied, moreover, that our enforcement of the general rule precluding appellate review of unpreserved issues does not constitute an injustice in this case.  Cf. State v. Gonzalez, 254 N.J. Super. 300, 304 (App. Div. 1992) (holding it would be unfair to require a defendant give up a plea agreement in order to challenge the constitutionality of N.J.S.A. 2C:35-12).

## VI.

To the extent we have not addressed them, any remaining arguments raised by defendants lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).  As to all four defendants, we remand with respect to the wiretap issues in accordance with the specific instructions set forth in subsection II(C) of this opinion.  If the trial court determines that the Wiretap Act was violated, it shall enter an order granting defendants' suppression motion with respect to all intercepted communications and evidence derived from those interceptions, vacate the judgments of conviction, reinstate all counts of the indictment that were dismissed pursuant to the plea agreements, and conduct further proceedings consistent with that determination.

As to Thomas, we also remand for the court to supplement the record and make additional findings of fact and conclusions of law with respect to the

canine sniff issue as instructed in subsections III(A) and (B) of this opinion. If the court determines that the search warrant for the Caravan was the fruit of an unlawful canine sniff and cannot be sustained under the independent source exception to the exclusionary rule, the court shall enter an order granting Thomas's motion to suppress physical evidence, vacate his guilty plea, and conduct further proceedings consistent with that determination.

We do not retain jurisdiction with respect to any of the remands ordered in this opinion. In all other respects, we affirm the Law Division orders.

Affirmed in part; vacated and remanded in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION